In the Matter of PATRICK J. RADIGAN et al., Petitioners, against JOHN F. O'CONNELL et al., Individually and as Members of the State Liquor Authority, Respondents.

First Department, April 8, 1952.

*Monroe I. Katcher, II,* for petitioners.

*William Hoppen* of counsel (*James J. Keefe* with him on the brief; *Alvin McKinley Sylvester,* attorney), for respondents.

SHIENTAG, J.   This is a proceeding to review a determination of the State Liquor Authority canceling the petitioners' liquor license and ordering a forfeiture of the petitioners' $1,200 license fee for the balance of the statutory period.   The action of the State Liquor Authority was taken after a hearing and on the basis of four charges each of which the Authority found was sustained:

(1) the failure to conduct a bona fide restaurant;

(2) the failure to keep adequate books and records;

(3) the sale of alcoholic beverages to an intoxicated or apparently intoxicated person, and

(4) permitting the licensed premises to become disorderly.

The determination of the State Liquor Authority was made as the result of a visit to the licensed premises by one of its investigators on three occasions: on July 25, 1951, between 5:35 P.M. and 7:45 P.M.; on August 1, 1951, between 7:10 P.M. and 8:30 P.M.; and again on August 2, 1951, between 12:00 noon and 2:00 P.M.

Petitioners are copartners, owning and operating a restaurant, bar and grill at premises 1438 Fulton Street in the borough of Brooklyn, city of New York.   The establishment is a very small one, containing seven tables and having a total seating capacity of twenty persons.   The premises are described by the investigator as " located in a section of Brooklyn inhabited by Negroes and the clientele is comprised of that race "; it is patronized in large part by longshoremen and laborers.

The premises have been licensed continuously since 1934 and have never been refused a renewal of license.   In March, 1948, petitioners received their license by way of transfer of ownership.   At no time since then has there been any occasion to institute any prior proceedings to revoke, cancel or suspend petitioners' license.   Apparently the main cause for the revoca-

tion of the license was based on Charge 1 " That the licensees have ceased to conduct on the licensed premises a bona fide restaurant, within the provisions of the Alcoholic Beverage Control Law ". This opinion will later deal fully with that charge, but before doing so I shall refer, more or less briefly, to the remaining three charges. Each of the four charges is separate and distinct and must stand or fall on the evidence relating to it.

The fourth charge is that the licensees " suffered or permitted premises to become disorderly in that there was the use of foul and profane language therein on July 25, August 1 and August 2, 1951." The investigator testified, without giving any particulars, that " the deportment of the patrons during my visits was generally unsatisfactory. The use of profanity was audible to all present; it was commonplace, and ignored by the management." On this subject he testified as follows:

" Q. Now, as far as the clientele of this restaurant, would you say that they are, as you said before, in a rather low income group? A. Yes, and perhaps not schooled in the best of the King's English.

" Q. What did you observe about them, when you were there, about the patrons that came in and out? A. Well, as I said earlier in my report, there was profanity used pretty broadly by the patrons, and this language was audible. The room is a relatively small one, and it was audible throughout the room. As you say they are of the low income group; it was apparent from their dress which was shabby, and in most cases they were not educated refined people in any sense. They were distinctly on the uncouth side, those that were present at least during my visits.

" Q. Would you say that those particular types of patrons would be in keeping with the neighborhood where this bar and grill is located? A. On the whole, I would."

On cross-examination the investigator gave the following testimony:

" Q. Mr. Johnson, this profanity you spoke of, when you were there, it was ignored by the management, is that right? A. That's correct.

" Q. And ignored generally by all the customers, there? A. Yes.

" Q. It was common ordinary language used by people at that type of gatherings, is that so? A. No one entered any objection to it, if that's what you mean.

" Q. It wasn't offensive to anybody there?  A. It didn't appear to be.

" Q. The people were peaceful, is that right?  A. Nobody was angry at anybody else there, no.

" Q. The profanity which you heard was used in the ordinary conversation, was it not, among the group there?  A. It was in ordinary conversational tones, but they were audible throughout the premises, if that is what you're driving at.

" Q. Was the profanity used in connection with any violence or fighting?  A. No, there was no violence.

" Q. All peaceable and happy among themselves, is that right? A. That's true."

Surely, on the basis of the foregoing, it can hardly be said that the State Liquor Authority established by substantial evidence that these licensed premises were being conducted in a disorderly manner, and that charge should be dismissed.

The third charge is that " the licensees violated Section 65, of the Alcoholic Beverage Control Law in that they sold, delivered or gave away or permitted to be sold, delivered or given away alcoholic beverages to an intoxicated person or to a person or persons actually or apparently under the influence of liquor, on August 1, 1951." What is the basis of this charge which resulted in the revocation of the liquor license? The investigator testified:  " On August 1, 1951, I made a second visit to these premises at 7:10 P.M., remaining until 8:30 P.M. On this occasion I found Radigan [one of the licensees] working alone. I ordered a drink from him, and stood at the bar. During this visit a colored man, dressed in shabby clothes entered the premises with another man. The shabbily dressed man staggered badly, his eyes were bloodshot, he was talking incoherently in part. During his speech to his companion, he leaned heavily on the bar for support. He ordered a large bottle of beer from Radigan, and Radigan without any question or hesitation served this man who was apparently intoxicated, a bottle of beer and gave him 2 glasses. The man staggered to a table where, with his companion he consumed the beer. The bottle of beer was ordered and paid for by the apparently intoxicated person." On cross-examination he gave the following testimony:

" Q. You testified that a man came in there, and appeared to you to be intoxicated, is that right?  A. That's correct.

" Q. Did you at any time get close enough to smell his breath? A. That I did not.

" Q. He appeared to be staggering, his eyes were somewhat bloodshot, and that he went to the bar?  A. That's right.

" Q. He ordered a quart bottle of beer, paid for it, and sat down at a table with two glasses? A. That's right.

" Q. And the companion with him, did he appear to be perpectly normal? A. He seemed to be sober, yes.

" Q. He walked from the bar to the table by himself, did he not? A. Yes, I think I characterized his movement as ' staggered from the bar to the table '.

" Q. He walked in a jerky fashion, is that an apt description of how he walked? A. That's relatively correct."

The licensee testified that he knew the man described by the investigator; " That man is a janitor who lives across the street. His name is Willy. That's all I know him by, the name of Willy, and he walked lame, and one of his arms is always swinging. When he comes in his arms swing up against the bar."

" Q. Is he suffering from some physical defect that you know of? A. He has physical defects.

" Q. Now, at any time have you ever served anybody who appeared to be intoxicated? A. No, at no time."

The investigator gave no particulars with respect to the alleged incoherent language of this customer. He did not say how long he kept him under observation nor did he describe his conduct while drinking the beer. To support this charge, likewise, there was no substantial evidence and it should have been dismissed.

The second charge is " that the licensees have failed to keep and maintain on the licensed premises adequate and accurate books and records of the business conducted on the licensed premises as required by Section 106, subd. 12, of the Alcoholic Beverage Control Law." There is no substantial evidence to sustain the finding with respect to this charge. The Legislature never intended, in providing for the maintenance of adequate books and records of a licensee's business, that a licensee was obliged to resort to the ultimate refinements of a complicated bookkeeping and accounting practice system. The investigator himself gave this testimony:

" Mr. Johnson, with respect to the books and records, did you check the bills for alcoholic beverages against entries in the ledger?

" The Witness: Yes, I did, and they were found to be in order.

" Q. The bills contained the usual information as to gallonage, price, name and address and so forth?

" A. Yes, they did. * * *

" The Witness: The only vague part of it was these bills for food purchases, which I stated before I couldn't check because they didn't bear dates, and in many cases did not list the items of food purchases. They simply had these amounts written on them in pencil."

The investigator also testified that he could not substantiate daily sales except by these slips. There were no guest checks used and no cash register tapes showing the breakdown. At the time the inspector visited the premises there was an old type of cash register upon which it was impossible to ring up separate food sales and separate beer and liquor sales; only one type of sales could be rung up. Since then a new type of cash register has been installed which provides for separate totals. The testimony of the accountant who kept the books for the licensees establishes that there was a substantial compliance with the law with reference to the keeping of books and records. In any event, in the light of the seventeen-year record of this establishment and of its general character, a direction by the State agency as to the method by which the licensees should maintain their records would have been appropriate. The record is barren of any such direction or even suggestion emanating from the agency or any of its staff. This charge likewise is without substantial basis and should have been dismissed. Indeed the attitude of the State Liquor Authority with respect to this charge seems to be reflected in its brief where it is said: " Even should the court find that this evidence is insufficient, it appears that there is more than enough evidence on the other charges to support the determination of the Authority ".

We come now to what apparently is the main charge against these licensees, namely charge No. 1, that they " have ceased to conduct on the licensed premises a bona fide restaurant within the provisions of the Alcoholic Beverage Control Law." It is pertinent to observe that no warning of any kind appears to have been given to these licensees as to their alleged failure to come up to State Liquor Authority menu standards, although counsel for the Authority acknowledged on the argument of the appeal that consonant with fairness, it was the general practice of the Authority to give a warning in such cases (unless there were other charges filed) and then observe compliance before charges are preferred.

I shall not deal with the point urged by the petitioners concerning the effect of the enactment of chapter 605 of the Laws

of 1950 which removed from the law the mandatory requirement for the cancellation of a liquor license where the licensee ceased to conduct on the licensed premises a bona fide restaurant and made that discretionary with the Authority. I shall address myself to the merits of the charge because I believe that the action of the State Liquor Authority with respect thereto was without substantial basis in fact or in law, and that its determination should be annulled.

I have already described the nature of the business conducted by the petitioners, its size, its clientele. The record establishes that these premises, which have been licensed and relicensed by the respondents each year since 1934 as a bona fide restaurant, are a small neighborhood bar and grill containing seven tables and a total seating capacity of twenty persons. It is in a neighborhood patronized by people of low-income groups. So far as appears in the record, the character of these premises has remained unchanged during all of these years. No statutory provision and no rule or regulation of the respondents prescribes a mandatory ratio of food sales to alcoholic beverage sales for on-premises licensees. No statutory provision and no rule or regulation of the respondents prescribes the variety of the menu or the elaborateness of the cutlery and china to be placed before the patrons of premises which differ in character and vary with the particular clientele and neighborhood. Obviously what might be a bona fide restaurant in one neighborhood or section of the State might not be a bona fide restaurant in a different type of area patronized by a different type of clientele. Yet each type of clientele is entitled to the service which the Alcoholic Beverage Control Law envisages. And the season of the year naturally has a bearing on the nature and extent of the food offered. Significantly, the observations upon which the charges were based were made on three days at the peak of midsummer heat.

The respondents' own investigator admitted that on each of the occasions he was offered sandwiches, or ham and eggs, or salad. He testified " As I paid Mrs. Miller [one of the licensees] for the beer, I asked her what I could get to eat. She said she could fix me some ham and eggs. When I asked what else she had, she informed me that she had one half of a ham cooking on the stove, and later on she would have ham and cabbage. At the time she said all she could give me was ham or cheese, liverwurst or bologna sandwiches, or the ham and eggs which she had offered me. I asked her if she had any vegetables, and

she told me she had none.'' The investigator went on to describe the foods and the equipment that he found in the kitchen. '' In prepared food, I found one half of a ham of about 8 pounds cooking on the stove as Mrs. Miller had told me. With regard to unprepared food, I found a can of luncheon meat, about 3 pounds of liverwurst, 2 pounds of bologna, 2 pounds of butter, a can of tomato catsup, 2 heads of lettuce, a bunch of carrots, 4 pounds of tomatoes, 2 dozen eggs, 12 cans of buttered beans, 1 can of salmon, a box of Bisquick, 2 loaves of bread. At the time, there wasn't any sign of the cabbage which Mrs. Miller told me she intended to prepare. The kitchen had the following equipment: a 4 burner gas stove, oven and broiler, a Frigidaire, a sink, a 2 -slot electric toaster, 19 knives, 18 forks, 4 tablespoons, 3 teaspoons, 17 dinner plates, 7 soup plates, 9 cups and saucers, 7 side dishes, 15 cooking utensils. Most of the utensils were dirt encrusted, and gave the appearance of not having recently been used.'' The paucity of spoons may be accounted for by the fact that the normal beverage in this place apparently was beer rather than tea or coffee. The investigator testified to a substantial amount of food purchases per month.

'' I further questioned Mrs. Miller as to how it was possible for her to sell the volume of food shown on such small food purchases. For instance, during June, 1951, the records show food sales of $1,002.35 against food purchases of $384.84. She offered the explanation that she frequently bought inexpensive fish, and pigs' feet, and prepared them with potato salad which she sold at very large profits. She stated that she would go to the fish market, and buy a large fish for maybe $2.50, or that she would go to the butcher shop and get the pigs' feet and pig's hocks for about 14¢ a pound, and she would prepare them with potato salad, and sell them at a large profit. That was her method or reason that she gave me for the apparent discrepancy between her food purchases and her food sales.

'' Q. This restaurant was in a neighborhood patronized by people of low income group? A. I would say that, yes.

'' Q. Therefore they might be in the habit of partaking of that particular type of food, right? A. That's right; that's what Mrs. Miller told me.

'' Q. I mean you, of your own observation? A. I would say that that's the type of food that they would partake of.''

He further testified as follows:

'' Q. At the time you went there, that was in the heat of the summer, wasn't it? A. Yes, it was July and August.

" Q. So during that time, ham and potato salad, and that sort of stuff, would be more so on the menu than hot dishes, is that so? A. Quite possible."

Witnesses were called on behalf of the licensee, testifying generally to the variety of food served in the bar and grill during the year.

We hold that the showing made by the Authority, confined as it was to a single period of low ebb in restaurant offerings, and without any appropriate prior warning, was not sufficient to sustain the charge that the licensee had ceased to operate a bona fide restaurant.

The determination accordingly should be annulled.

PECK, P. J., DORE, COHN and BERGAN, JJ., concur.

Determination unanimously annulled, with $50 costs and disbursements to the petitioners.